FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

04 MAY 14 AM 10: 33

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| NATASHA GROOM, | ] | |
| Plaintiff, | ] ] ] | |
| vs. | ] | CIVIL ACTION NO. 01-RRA-1196-J |
| TOWN OF PARRISH, et al., | ] ] ] | |
| Defendants. | ] | |

ENTERED
MAY 14 2004

## MEMORANDUM OF DECISION

Pending before this court are the motions for summary judgment filed by defendants Morris Polion, the chief of police for the Town of Parrish ("Polion")(Document 111); Kevin Martin, the chief of police for the City of Dora, Alabama ("Martin") and Stan Bryan, a police officer for the City of Dora, Alabama ("Bryan")(Document 116); the City of Sumiton, Alabama ("Sumiton"), John Bentley, a police officer for the City of Sumiton, Alabama ("Bentley"), Stanley Akers, a police officer for the City of Sumiton, Alabama ("Akers"), and Richard Schultz, the chief of police for the City of Sumiton, Alabama ("Schultz")(Document 125);[1] Charles Madison, a reserve police officer for the City of Cordova, Alabama ("Madison")(Document 127); the City of Cordova, Alabama ("Cordova"), Shane Dickinson, a police officer for the City of Cordova, Alabama ("Dickinson"), and Scott Whorton, the chief of police for the City of Cordova, Alabama ("Whorton")(Document 171).   Upon

---

[1] Schultz was dismissed from the case on September 16, 2002; therefore, his motion for summary judgment is MOOT.

consideration of the motions, the arguments, the record, and the law, the court finds that the motions for summary judgment are due to be granted.

I. FACTS[2]

On June 7, 1999, between the hours of 11:30 and 11:45 p.m., Parrish police officer Frederick Boles was shot while responding to a call regarding a vehicle whose driver was acting suspiciously and was suspected of being involved in drug activity.[3] Polion Affidavit, p. 1. The car was identified as having a license plate from a state distant from Alabama. Polion Affidavit, p. 1. Officers from other law enforcement agencies, including the Alabama Bureau of Investigation were notified of the shooting and traveled to Parrish to assist with the investigation. Polion Affidavit, p. 2, Polion Deposition, p. 17.

Chief Polion and Officer Boles returned to Parrish to interview neighbors in the area in which Boles had been shot. Polion Affidavit, p. 2. Cordova police officers Charles Madison and Shane Dickinson received a call for assistance from the Parrish police department. Madison Affidavit, p. 1, Madison Deposition, pp. 10-11, 16, Dickinson Affidavit, p. 1. They were advised about the tip Parrish police had received about the car with the out-of-state license plate. Dickinson Affidavit, p. 1. Officers Madison and

---

[2] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Insurance Co. of Georgia, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[3] Boles did not see the car in question, but was shot while responding to the call about the car. Polion Deposition, p. 42.

2

Dickinson traveled to the Dora Villas Apartments in Dora, Alabama. Dickinson Affidavit, p. 1. In the parking lot of the apartment complex, they located a vehicle that matched the description of the vehicle in question. Dickinson Affidavit, p. 1. Madison and Dickinson telephoned the Parrish police and informed them that they had located the vehicle. Dickinson Affidavit, p. 1. Then, they waited at the apartments for the officers from Parrish and other jurisdictions to arrive.[4] Dickinson Affidavit, p. 1.

Sumiton police officers John Bentley and Stanley Akers also traveled to Groom's apartment complex in response to a call for assistance from Officer Stan Bryan of the Dora Police Department. Bentley Affidavit, p. 2, Akers Affidavit, p. 2. Bryan was waiting near the office of the Dora Villa Apartments when Bentley and Akers arrived there. Bentley Affidavit, p. 2, Akers Affidavit, p. 2.

Polion received notice that a vehicle matching the description of the suspicious vehicle had been found at an apartment complex in Dora. Polion Affidavit, p. 2, Polion Deposition, pp. 25-26. Polion went to the apartment complex, where officers from other jurisdictions were already present. Polion Affidavit, p. 2. Officer Bryan was waiting at the entrance of the apartments when the Parrish officers arrived.[5] Bryan Affidavit, p. 1. Officer Bryan followed

---

[4] Cordova police chief Scott Whorton was not on duty at the time and did not go to the apartment complex. Whorton Affidavit, p. 1.

[5] Officer Bryan was the only Dora police officer on duty at the time. Martin Deposition, p. 10. Bryan had been contacted by Dora's dispatcher to assist with the investigation of the shooting and was instructed to go to the Dora Village Apartments. Bryan Affidavit, p. 1. Bryan drove to the apartment complex and waited for the other officers at the end of the driveway leading to the apartments. Bryan Affidavit, p. 1.

3

the Parrish officers into the parking lot, parked his car, then got out of his vehicle. Bryan Affidavit, p. 2.

Polion recognized the vehicle in question as Natasha Groom's vehicle.[6] Polion Affidavit, p. 2, Polion Deposition, p. 27. Polion and some other officers approached the door to Groom's apartment. Polion Affidavit, p. 2, Polion Deposition, p. 20. Officers Madison and Dickinson of the Cordova Police Department and Officer Skip Dobson of the Oakman Police Department went to the opposite side of Groom's apartment to ensure that the occupants did not exit out the other door. Dickinson Affidavit, p. 2, Madison Deposition, p. 20. At about 4:30 a.m., Polion knocked on Groom's door. Polion Affidavit, p. 2, Polion Deposition, p. 20, Groom Affidavit, p. 1. Groom and her boyfriend were asleep. Groom Affidavit, p. 1. When Groom asked who was at the door, Polion replied, "Police." Polion Affidavit, p. 2, Polion Deposition, p. 21, Groom Affidavit, p. 2. Groom "barely opened [the] door to look out." Groom Affidavit, p. 2. Groom, wearing only panties and a t-shirt, asked what was going on. Groom Affidavit, p. 2. "[A] number" of police officers forced their way into Groom's apartment, with their guns drawn, yelling at her to "get back." Groom Affidavit, p. 2.

---

[6] Polion knew Groom socially because she had dated a Parrish police officer at one time and had been involved in some "confusion" that took place during a town council meeting. Polion Affidavit, p. 2, Polion Deposition, pp. 12-13. Polion also knew Groom's current boyfriend, who had been arrested by the Town of Parrish on drug charges. Polion Affidavit, p. 2. Additionally, Polion was dating Groom's cousin and had been to Groom's apartment several times. Groom Affidavit, p. 3.

4

Madison, Dickinson, and Dobson remained at the opposite entrance to Groom's apartment until they heard a call over the radio indicating that the Parrish officers were speaking to Groom inside her apartment. Dickinson Affidavit, p. 2. Madison, Dickinson, and Dobson then returned to the other side of the apartment. Dickinson Affidavit, p. 2. Madison stood in the doorway of Groom's apartment. Madison Deposition, p. 23. Dickinson entered the apartment.[7] Dickinson Affidavit, p. 2. Madison stood "right in the doorway" of Groom's apartment.[8] Madison Deposition, p. 23.

Dora Officer Bryan remained in the parking lot beside his car the entire time. Bryan Affidavit, pp. 1-2. He never entered Groom's apartment, never spoke to her, and never searched her apartment. Bryan Affidavit, pp. 1-2.

---

[7] Based upon what he had heard from Polion, Dickinson believed that either Groom or someone else in her apartment had been involved in the shooting. Dickinson Affidavit, p. 2. Dickinson also believed that the officers who were already present in Groom's apartment had been given consent to enter or had otherwise determined that there was probable cause to enter the apartment. Dickinson Affidavit, p. 2. Dickinson used his discretion to determine that it was lawful to enter the apartment. Dickinson Affidavit, p. 2.

[8] In her brief, Groom maintains that Madison "admitted in his deposition that he was <u>one of the officers that [sic] entered into the plaintiff's home</u> on the night in question." Plaintiff's Memorandum in Opposition to the Defendants' Motion for Summary Judgment Based on the Doctrine of Qualified Immunity, Doc. 152, p. 3 (emphasis in original). The plaintiff's statement is somewhat misleading. Madison actually testified in his deposition as follows:
   Q: Did you go in?
   A: I stood right in the doorway.
   . . .
   Q: You say you stopped right at the front door but didn't enter into the unit after you came around from the back?
   A: You could probably say that I was inside the residence, because I was right in the doorway.
Madison Deposition, pp. 23 - 27. Madison never testified to going any further into Groom's apartment than the doorway.

5

Polion informed Groom about the shooting and the report that a vehicle similar to hers had been seen in the area. Polion Affidavit, p. 2, Polion Deposition, p. 33. Polion, Akers and "a big tall officer" proceeded to search Groom's home. Groom Affidavit, p. 2. Groom did not consent to the officers entering her apartment or searching it. Groom Affidavit, p. 2. Dickinson read Groom her *Miranda* rights. Dickinson Affidavit, p. 2, Groom Affidavit, p. 3. Another officer told Groom that an eye witness had identified her car as being in the area of the shooting and another officer started yelling at Groom, that a police officer had been shot. Groom Affidavit, p. 3. The officers then woke Groom's boyfriend and made the couple sit in the living room while they continued their search. Groom Affidavit, p. 2. Groom's boyfriend informed the officers that he had been in the area earlier that day, but had not been around at the time of the shooting. Polion Affidavit, p. 2, Polion Deposition, p. 34, Groom Affidavit, p. 2. The officers remained in Groom's apartment for approximately forty-five minutes. Groom Affidavit, p. 2. When the officers realized that Groom's vehicle was not the one they were looking for, the officers left Groom's residence. Polion Affidavit, p. 2, Polion Deposition, pp. 34-35, Dickinson Affidavit, p. 2. Groom stated that Polion, Akers, and the big, tall officer searched her kitchen, bedroom, bathroom, closets, and under her bed. Groom Affidavit, p. 2.

Groom refused the officers' request to search her car. Groom Affidavit, p. 3. Two officers from Cordova, Parrish, Oakman, Dora, Sipsey, Sumiton, Jasper, and Walker County surrounded the apartment complex and would not let Groom's cousin cross the street to "see what was wrong." Groom Affidavit, p. 3.

Polion returned to Groom's porch and informed Groom that someone must have been trying to set her up. Groom Affidavit, p. 3. He apologized and said Groom and her boyfriend "could get some sleep." Groom Affidavit, p. 3. Groom could not sleep because she was humiliated, angry, and violated. Groom Affidavit, p. 3.

After leaving Groom's apartment, the officers continued their investigation. Polion Affidavit, p. 2, Polion Deposition, pp. 34-35.

## II. PROCEDURAL HISTORY

The plaintiff filed her original complaint in this action on May 10, 2001. She filed amendments to the complaint on May 21, 2001 and June 7, 2001. On August 31, 2001, the plaintiff was ordered to file, within seventeen days, an amended complaint, containing all of her claims against all parties, that would supersede all of the previous complaints she had filed. On September 17, 2001, Groom filed a document entitled "Plaintiff's Third Amendment to Complaint." On November 7, 2001, the court entered an order finding that the "Plaintiff's Third Amendment to Complaint" superseded all previous complaints and amendments and that it would be considered as the only complaint in this action. The first count alleges that the defendants violated Groom's constitutional rights under 42 U.S.C. § 1983 when they "organized, executed or otherwise participated in . . . a warrantless search and entry into [her] home on June 8, 1999, without exigent circumstances." The second count alleges state law claims against the defendants for invasion of privacy; intentional infliction of emotional distress; negligence, carelessness, and unskillful conduct; negligent retention and supervision; trespass; and the tort of outrage.

The defendants have filed five separate motions for summary judgment on the issue of qualified immunity. Defendant Morris Polion filed a motion for summary judgment on January 22, 2002. Defendants Kevin Martin and Stan Bryan filed a motion for summary judgment on January 24, 2002. Defendants John Bentley, Stanley Akers, Richard Schultz, and the City of Sumiton filed a motion for summary judgment on February 5, 2002. Defendant Charles Madison filed a motion for summary judgment on February 12, 2002. On August 15, 2002, Groom filed a "Motion in Opposition" to the motions for summary judgment filed by defendants Polion, Akers, Bentley, and Madison.[9] Defendant Polion filed a reply brief on August 27, 2002.

Defendants Shane Dickinson, Scott Whorton, and the City of Cordova filed a motion for summary judgment on October 17, 2003. On November 5, 2003, Groom filed a motion in opposition to defendant Dickinson's motion for summary judgment.[10] On November 20, 2003, defendants Madison, Whorton, Dickinson, and the City of Cordova filed a reply to Groom's opposition to Dickinson's motion for summary judgment.

III. DISCUSSION

A. Motions for Summary Judgment

---

[9] Groom has not opposed the motions for summary judgment filed by defendants Martin, Bryan, and the City of Sumiton. Thus, their motions are due to be GRANTED and any claims against them are due to be DISMISSED.

[10] In her motion in opposition to Dickinson's motion for summary judgment, Groom states that she does not object to defendant Whorton's claim of qualified immunity. Additionally, Groom has not opposed the motion for summary judgment filed by the City of Cordova. Thus, the motions for summary judgment of Whorton and the City of Cordova are due to be GRANTED and any claims against them are due to be DISMISSED.

1. Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman,*

10

873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen,* 121 F.3d at 643.

### 2. Analysis

The defendants have moved for summary judgment based on the theory that they are entitled to qualified immunity.

> Qualified immunity provides protection for government officials performing discretionary functions and sued in their individual capacities as long as their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." *Lassiter v. Ala. A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (*en banc*) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. CT. 2727, 2738, 73 L. ED. 2D 396 (1982)). As we said in *Lee v. Ferraro*:
> > Qualified immunity offers "complete protection for government officials sued in their individual capacities as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Thomas v. Roberts,* 261 F.3d 1160, 1170 (11th Cir. 2001) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. CT.

11

> 2727, 2738, 73 L. ED. 2D 396 (1982)) (additional quotations omitted). The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, *see Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. CT. 3034, 3038, 97 L. ED. 2D 523 (1987), protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001). Because qualified immunity is a defense not only from liability, but also from suit, it is "important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998) (citation omitted).

284 F.3d at 1193-94. If reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity. *See Hunter v. Bryant*, 502 U.S. 224, 228, 112 S. CT. 534, 537, 116 L. ED. 2D 589 (1991).

> Under qualified immunity analysis, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place. *See Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991).

*Storck v. City of Coral Springs*, 354 F.3d 1307, 1313-1314 (11th Cir. 2003). Here, it is undisputed that the defendant officers were acting within the scope of their discretionary authority when they searched Groom's apartment.[11]

> Once the public official has established that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity does not apply. *See Lee v. Ferraro*, 284 F.3d at 1194. To determine if the plaintiff has met her burden, we apply the Supreme Court's two-part test for evaluating a claim of qualified immunity: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" and (2) if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. CT. 2151, 2156, 150

---

[11] The defendants deny that Groom's apartment was searched. However, since Groom claims that her apartment was searched, the court assumes for summary judgment purposes that the search did occur.

> L. ED. 2D 272 (2001). Thus, if no constitutional violation is established, then the officer prevails, and "there is no necessity for further inquiries concerning qualified immunity." *Id.* On the other hand, if the facts establish a constitutional violation, we must determine whether, at the time of the violation, the right was clearly established, an inquiry that "must be undertaken in light of the specific context of the case [and] not as a broad general proposition. . . ." *Id.*

*Storck*, 354 F.3d at 1314.

Here, Groom argues that the defendants violated her Fourth Amendment right to be free from unreasonable searches and seizures by conducting a warrantless search of and entry into her home without exigent circumstances.

> "A warrantless search is presumptively unreasonable." *United States v. McGregor*, 31 F.3d 1067, 1068 (11th Cir. 1994). "A search without a warrant based on probable cause is illegal, unless" exigent circumstances exist or the subject consents to the search. *United States v. Campbell*, 920 F.2d 793, 795 (11th Cir. 1991); *Steagald v. United States*, 451 U.S. 204, 206, 101 S. CT. 1642, 68 L. ED. 2D 38 (1981) ("[W]arrantless searches" are unreasonable "absent consent or exigent circumstances. . . .").
> 
>   In other words, "when probable cause exists, 'if exigent circumstances' make it impossible or impracticable to obtain a warrant," the warrant requirement "will be excused." *Id.*; *see also Swint*, 51 F.3d at 998. "Recognized situations in which exigent circumstances exist include: danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect." *Reid*, 69 F.3d at 1113.

*Walters v. City of Andalusia*, 89 F. Supp. 2d 1266, 1284 (M.D. Ala. 2000)(footnote omitted).

> [W]hether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials. . . . The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.

*Anderson v. Creighton*, 483 U.S. 635, 641 (1987). In the case before the court, whether qualified immunity is to be afforded the defendants can be determined even though the defendants deny that they conducted a search. This can be accomplished by operating on the assumption that there was a search, as the plaintiff claims, and considering the clear inferences of the plaintiff's evidence of the search or the lack of factual issues raised by that evidence.

It is concluded that the defendants had probable cause to believe that exigent circumstances existed to allow them to search Groom's apartment without a warrant. Officer Boles had been shot approximately five hours prior to the search of Groom's apartment, while he was responding to a call about a vehicle whose driver was acting suspiciously and was suspected of being involved in drug activity. The description of the car, color, make, and out-of-state tags, was similar to Groom's car. The local police were familiar with Groom's boyfriend, who had been involved previously in drug activity in the area. When Groom's car was located at her apartment complex, the police had probable cause to believe that her car could have been the car reported earlier and that her car could have been involved in the shooting of Officer Boles, while he was following up on a report about the car. Additionally, the police had probable cause to believe that Groom's boyfriend, who was known to have been involved in drug activity in the past, could have been the driver of the suspicious car and that he could have been involved with or have direct knowledge about the shooting of the police officer. In light of these facts, it was reasonable for the officers to conclude that the search was necessary to prevent further danger of harm to police officers or the general public, or that it was necessary to prevent the escape of Groom's boyfriend if he had been involved in the shooting, or both. There is no evidence that Polion and Akers, *the only*

*defendants the plaintiff has identified by name as having searched her home*, were looking in drawers or containers or ransacking her home in any way. There is no evidence from which to infer that the men conducting the search were looking to find anything other than whether there were other persons in the house.

Thus, viewing the facts in the light most favorable to Groom, she has not established a constitutional violation because the defendants had probable cause to believe that exigent circumstances existed to allow them to enter into and search her apartment without a warrant. Moreover, even if Groom had presented sufficient facts to allege a violation of a constitutional right, she had not met her burden of proving that such a right was clearly established. The defendants are entitled to qualified immunity.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment are due to be granted. An appropriate order will be entered.

DONE this 13th day of May, 2004.

Robert R. Armstrong, Jr.
United States Magistrate Judge